## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DISTRICT NO. 1, PACIFIC COAST DISTRICT, MARINE ENGINEERS' BENEFICIAL ASSOCIATION AFL-CIO, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 17-2173 (ABJ) |
| LIBERTY MARITIME CORPORATION, | ) ) | |
| Defendant. | ) ) ) | |

## <u>MEMORANDUM OPINION</u>

This case involves a dispute between a labor union, District No. 1, Pacific Coast District, Marine Engineers' Beneficial Association AFL-CIO ("MEBA"), and a shipping company, Liberty Maritime Corporation, over whether a particular ship, the *Liberty Peace*, is covered by the parties' collective bargaining agreement ("CBA").  Plaintiff filed suit to compel defendant to arbitrate the dispute, and pending before the Court are the parties' cross-motions for summary judgment.

Based on the parties' agreements, the Court holds that the parties are bound by a valid contract with an arbitration provision.  Because the question of whether the *Liberty Peace* is covered by the parties' CBA is a matter of contract interpretation that falls within their arbitration agreement, defendant's motion for summary judgment will be **DENIED** and plaintiff's motion for summary judgement will be **GRANTED**.

## PROCEDURAL HISTORY

On October 19, 2017, plaintiff District No. 1, Pacific Coast District, Marine Engineers'
Beneficial Association AFL-CIO ("MEBA" or the "union") brought this action against defendant
Liberty Maritime Corporation ("Liberty") pursuant to Section 301 of the Labor Management
Relations Act ("LMRA"), 29 U.S.C. § 185. Compl. [Dkt. # 1] ¶ 1. Plaintiff alleges that defendant
refused to arbitrate a dispute it asserts was required to be arbitrated under the CBA, and it seeks
an order compelling arbitration. Compl. ¶¶ 25–30. After Liberty answered the complaint, *see*
Ans. [Dkt. # 6], plaintiff moved for judgment on the pleadings. Pl.'s Mot. for J. on the Pleadings
[Dkt. # 10]; Pl.'s Mem. in Supp. of Pl.'s Mot. [Dkt. # 10-1].

On September 14, 2018, the Court granted plaintiff's motion for judgement on the
pleadings and ordered the parties to arbitrate their dispute. Mem. Op. [Dkt. # 14]. Defendant
appealed, and on August 9, 2019, the Circuit Court ruled that the question of whether the dispute
was subject to arbitration could not be decided as a matter of law on a motion for judgment on the
pleadings under Federal Rule of Procedure 12(c) because material facts remained in dispute
regarding the authenticity of the contracts provided to the Court and the existence of an applicable
arbitration clause. *See Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n AFL-CIO v.
Liberty Mar. Corp.*, 933 F.3d 751, 762 (D.C. Cir. 2019) (holding that Liberty's denial of MEBA's
allegation that Exhibits A and B were copies of the Master Agreements in its answer "means that
Exhibits A and B were not authenticated copies of the two Master Agreements"). The Circuit
Court remanded the matter, instructing the district court to "determine[] whether Liberty and
MEBA had a valid contract for arbitration by looking at their whole agreement." *Id.* at 764.

On remand, the Court dispatched the parties to conduct discovery on "whether there was a
meeting of the minds and the terms of any complete agreement." Order [Dkt. # 24] at 2–3 (noting

the "Appellate Court found that the Court must make a factual determination of what constitutes the parties' full agreement and whether that full agreement includes an arbitration clause applicable to the parties," citing *Dist. No. 1*, 933 F.3d at 762–63, and authorizing defendant to take a Rule 30(b)(6) deposition regarding the authenticity of the documents produced by plaintiff).

Following discovery, the parties filed cross-motions for summary judgment.  *See* Def.'s Mot. for Summ. J. [Dkt. # 30]; Def.'s Statement of Material Facts of Which There is No Genuine Dispute and Mem. in Supp. [Dkt # 30-1] ("Def.'s Mem."); Pl.'s Mot. for Summ. J. [Dkt. # 32]; Pl.'s Statement of Undisputed Material Facts and Mem. in Opp. to Def.'s Mot. and in Supp. of Pl.'s Mot. [Dkt. # 32-1] ("Pl.'s Opp."); Def.'s Reply to Opp. [Dkt. # 35] ("Def.'s Reply"); Pl.'s Reply to Opp. [Dkt. # 37] ("Pl.'s Reply").  The motions are ripe for decision.

## FACTUAL BACKGROUND

Plaintiff MEBA is a labor union that represents employees in the U.S. maritime industry who work at ports in the United States and on oceangoing vessels.  Compl. ¶ 2; Ans. ¶ 2.  Liberty is a shipping company that operates various seagoing vessels, and many of its employees are represented by MEBA.  Compl. ¶ 3; Ans. ¶ 3.  Some of Liberty's ships participate in the Maritime Security Program ("MSP"), a federal program that provides a stipend to U.S.-flagged vessels in exchange for making the vessels available to the U.S. government under certain circumstances, such as during times of war or national emergency.  Def.'s Statement of Undisputed Material Facts, Def.'s Mem. 3–10 ("Def.'s SUF") ¶ 4.

## I.    The Master Agreements and First MOU

The parties have had a collective bargaining relationship with respect to employees working on vessels managed by defendant since 1988, when Liberty became a signatory to two of the union's master agreements:  the 1986–1990 Tanker Vessels Master Agreement and the 1986–

1990 Dry Cargo Vessels Master Agreement.  Compl. ¶ 6; Ans. ¶ 6; Def.'s SUF ¶ 7.  The agreements are attached to defendant's motion for summary judgment.  *See* 1986–1990 Tanker Vessels Master Agreement, Ex. 1 to Def.'s Mem. [Dkt. # 30-3] ("Tanker M.A."), and the 1986–1990 Dry Cargo Vessels Master Agreement, Ex. 2 to Def.'s Mem. [Dkt. # 30-4] ("Dry Cargo M.A.").  Plaintiff does not challenge the authenticity of these copies of the Master Agreements.  So the question regarding the authenticity of the Master Agreements has been resolved.  *See* Pl.'s Mem. at 7 (no response to defendant's statement ¶ 7 regarding the Master Agreements or defendant's copies of the agreements attached as Exhibits 1 and 2 to the Declaration of William P. Campbell).[1]

The Dry Cargo Master Agreement establishes a collective bargaining relationship between the parties "with respect to any U.S. Flag ocean-going dry cargo and passenger vessel which [Liberty] either owns or operates as an agent or under bareboat charter."  Dry Cargo M.A., Preamble, at 1 (emphasis added).  The Tanker Master Agreement establishes the same relationship between the parties as to "any U.S. flag ocean going tanker vessel."  Tanker M.A., Preamble, at 1.  Each agreement recognizes plaintiff as the sole representative of the licensed engineers for the purpose of collective bargaining.   Dry Cargo M.A. at 2; Tanker M.A. 3.

Each agreement contains an identical arbitration provision:

> SECTION 2.  GRIEVANCE PROCEDURE AND ARBITRATION . . .
>
> All disputes relating to the interpretation or performance of this Agreement shall be determined in accordance with the provision of this Section.

Tanker M.A. at 9–10; Dry Cargo M.A. at 9.  And each agreement expired on June 15, 1990.  Tanker M.A. at 98–99; Dry Cargo M.A. at 114.

---

1   Defendant's exhibits are attachments to the Declaration of William P. Campbell [Dkt. # 30-2] ("Campbell Decl.").  The Court will refer to each by exhibit number.

4

In June 1988, the parties also signed a Memorandum of Understanding ("MOU") amending certain provisions of the Master Agreements to reflect particular wages, benefits, and other terms agreed upon by the union and Liberty.   1988 MOU, Ex. 3 to Def.'s Mem. [Dkt. # 30-5]. Acknowledging that "the parties have a collective bargaining agreement *covering ocean-going tankers and dry cargo vessels*," which would expire on June 15, 1990, the MOU provided that "[a]ll wages, benefits, contributions and other terms and conditions of employment contained in the Standard Dry Cargo and Tanker Vessels Agreements (herein 'Agreement')," would apply to Liberty's vessels, except as set forth in the MOU.  1988 MOU at 1 (emphasis added).  So while there were two CBAs, the parties defined the term "agreement" to apply to both.

## II.   Subsequent MOUs

Periodically, the parties signed subsequent MOUs, Letters of Understanding ("LOUs"), and other agreements, which extended their CBA and revised wages, benefits, and other provisions as negotiated by the parties.

**1990 MOU.**  In 1990, the parties signed an MOU that purported to extend the CBA that was about to expire.  However, instead of referencing the CBA "covering ocean-going tankers and dry cargo vessels" that was due to expire on June 15, 1990, the 1990 MOU contained a "WHEREAS" clause that stated:  the parties "have a collective bargaining agreement *covering tanker vessels*" expiring on June 15, 1990.  1990 MOU, Ex. 4 to Def.'s Mem. [Dkt. # 30-6].  The parties then agreed as follows:

1.   DURATION OF AGREEMENT

The aforesaid Agreement, except as otherwise amended herein . . . shall be deemed a New Agreement (hereinafter "Agreement") to continue in full force and effect until midnight June 15, 1994.

1990 MOU at 1.

5

**1994 MOU.**  In 1994, the parties signed another MOU.  This time they agreed in the WHEREAS clause that the parties "have a collective bargaining agreement *covering tanker and bulk vessels*" expiring on June 15, 1994.[2]  1994 MOU, Ex. 5 to Def.'s Mem. [Dkt. # 30-7] (emphasis added).  The parties then agreed as follows:

> 1.  Duration of Agreement
>
> The aforesaid Agreement . . . shall be deemed a New Agreement (hereinafter "Agreement"), to continue in full force and effect until midnight June 15, 2000 . . . .

1994 MOU at 1.

**2000 MOU.**  In 2000, they signed another MOU that again acknowledged in a WHEREAS clause that "the parties hereto have a collective bargaining agreement *covering tanker and bulk vessels*" expiring on June 15, 2000.  2000 MOU, Ex. 6 to Def.'s Mem. [Dkt. # 30-8] (emphasis added).  The parties agreed as follows:

> 1.  DURATION OF AGREEMENT
>
> The aforesaid Agreement . . . shall be deemed a New Agreement (hereinafter "Agreement") to continue in full force and effect until midnight June 15, 2005 . . . .

MOU 2000 at 1.

---

2      Although the MOU refers to "bulk vessels" rather than "dry cargo vessels," the parties and their agreements use the terms interchangeably and in combination.  *See, e.g.*, Def.'s SUF ¶ 18, Def.'s Mem. at 8 (referring to the "June 2005 MOU, covering dry bulk vessels and tankers"); Def.'s Mem. at 18 (referring to the "August 2010 MOU covering dry bulk vessels and tankers").  Indeed, the 1988 MOU expressly provided that "Section 10(c) of the Dry Cargo Agreement shall be suspended with respect to the Company's bulk carriers," 1988 MOU at 2, which would be unnecessary if bulk vessels were not considered to be dry cargo vessels.  *See also* Pl.'s Mem., Ex. 3 to Decl. of Mark S. Gallagher [Dkt. # 32-5] at 4 ("The Dry Cargo and Tanker Agreements cover Liberty's ocean-going dry cargo bulkers and tankers.").

**The Maritime Security Program.**  In 2003, the federal government renewed the Maritime Security Program ("MSP") pursuant to the Maritime Security Act of 1996.  The MSP provides a significant annual stipend to shipping companies in exchange for the companies making their participating U.S.-flag vessels available to the government during times of war or national emergency, or when necessary for national security reasons.  46 U.S.C. §§ 53107(b)(1), 53106(a).

**June 2005 MOU.**  In June 2005, the parties signed a further MOU.  June 2005 MOU, Ex. 7 to Def.'s Mem. [Dkt. # 30-9].  A WHEREAS clause in it acknowledged that "the parties hereto have a collective bargaining agreement *covering tanker and bulk vessels*, as amended and supplemented from time-to-time by agreement and/or arbitration awards (herein 'CBA')" expiring on June 15, 2005.  June 2005 MOU at 1 (emphasis added).  The parties agreed as follows:

> 1.  DURATION OF AGREEMENT
>
> The aforesaid CBA . . . shall be deemed a New Agreement (hereinafter "Agreement") to continue in full force and effect until midnight June 15, 2010 and shall continue from year to year thereafter unless either party shall give written notice to the other of its desire to amend the Agreement, . . . .

2005 MOU at 1.  This MOU also provided:

> 11.  MISCELLANEOUS PROVISIONS . . .
>
> (g) Except as otherwise amended or modified herein, all remaining terms and provisions contained in the CBA as they existed on June 15, 2005 shall be fully incorporated and included in this Agreement as if fully set forth herein.

2005 MOU at 6.

## A.    The September 2005 MOU and Subsequent LOUs

Shortly after signing the June 2005 MOU, the parties entered into another MOU on September 23, 2005 that expressly extended coverage to new ships that Liberty planned to enroll

in the federal MSP.  *See* September 2005 MOU, Ex. 8 to Def.'s Mem. [Dkt. # 30-10].  According to defendant, this was the first time it would operate a vessel that was neither a tanker nor a dry bulk vessel; its new vessel the *M/V Alliance New York* was a pure car/truck carrier or "PCTC." Def.' SUF ¶ 12.

This MOU had a number of WHEREAS clauses.

> WHEREAS, MEBA and Liberty are party to a collective bargaining agreement ("CBA") dated June 15, 2005 as amended and supplemented from time-to-time by agreement and/or arbitration awards *covering tanker and dry cargo vessels* whereby MEBA represents all of the licensed deck and engineer officers (["]Licensed Officers") working aboard all of the United States flag vessel owned and operated by the Company; and

> WHEREAS, Liberty will operate one (or more vessels) covered by Maritime Security Program (MSP) Agreements(s) with the United State Government pursuant to [t]he newly enacted Maritime Security Act of 2003, which vessel(s) shall hereafter be referred to as the "MSP Vessel(s)" and

> WHEREAS, MEBA and Liberty wish to amend the CBA in order to account for the recent enactment of the Maritime Security Act of 2003, to be effective September 23, 2005[ ] and

> WHEREAS, MEBA and Liberty have reaffirmed their commitment of a long-term collective bargaining relationship to provide job security to the Union and uninterrupted operations to Liberty for the MSP Vessel(s):

2005 MOU at 1 (emphasis added).

The parties agreed as follows:

> 1. SCOPE OF AGREEMENT

> (a) The Memorandum of Understanding ("MOU") shall apply to and cover *all* and and [sic] *MSP Vessels owned and/or operated and/or managed by the Company*, and accordingly, it shall apply to and cover the Pure Car/Truck Carrier ("PC/TC") vessel named the M/V ALLIANCE NEW YORK, or such other name as may be given to that MSP Vessel.

> (b) Except as otherwise expressly provided in this MOU, the Company and Union agree that *all of the terms and conditions of the CBA are incorporated into this MOU* and shall remain in full force and effect for the duration of this MOU.

2005 MOU at 1 (emphasis added).  By its terms, this MOU was to remain in effect through June 15, 2015, and would continue "from year to year thereafter" until it was amended or terminated by either party.  2005 MOU at 2.  Finally, the MOU contained an arbitration clause that applied to grievances arising under the MOU:

> 15.  MISCELLANEOUS PROVISIONS . . .
>
> (b)  For all grievances arising under this MOU, the arbitrator shall be authorized to grant appropriate relief as he or she determines is appropriate. All unresolved grievances arising under this MOU shall be decided by the contract arbitrator selected in accordance with the terms contained in the CBA.

2005 MOU at 7.[3]

**2009 LOU.**  In June 2009, the parties signed a Letter of Understanding ("LOU") amending the September 2005 MOU to expressly cover a new vessel under the MOU – the PCTC *Liberty Pride*, which Liberty was taking delivery of and intended to reflag under U.S. flag registry.  2009 LOU, Ex. 11 to Def.'s Mem. [Dkt. # 30-13].  Liberty did not anticipate that the *Liberty Pride* would be "covered by a MSP Agreement though it [was] attempting to obtain the use of one."  2009 LOU.  Given this, the parties "amend[ed] the MOU such that it will apply to the operation of the PCTC LIBERTY PRIDE even though the vessel may not be covered by MSP

---

3       The parties also signed various side letters addressing the parties' agreements regarding specific circumstances.  For example, it signed an October 28, 2005 side letter that addressed what would happen if the Alliance New York were reflagged if it were no longer enrolled in the MSP. Ex. 1 to Pl.'s Opp. [Dkt. # 33-3] ("2005 Side Letter").

Agreement(s)."  2009 LOU.  It provided that except as provided in the LOU, "all other terms and conditions of the [September 2005] MOU [would] remain in full force and effect."  2009 LOU.

**2010 LOU.**  The following February, the parties amended the September 2005 MOU to expressly cover another vessel – the *Liberty Promise.*  2010 LOU, Ex. 13 to Def.'s Mem. [Dkt. # 30-15]; Def.'s SUF ¶ 18.  Like the *Liberty Pride*, the *Liberty Promise* was being added to defendant's fleet, would be reflagged as a U.S.-flag ship, and was not anticipated to be enrolled in the MSP.  2010 LOU.  The parties agreed, though, "that the Liberty Promise, even though not covered by MSP Agreement(s), will be considered an MSP Vessel under and subject to all of the terms and conditions of the [September 2005] MOU."  2010 LOU.  As with the 2009 LOU, the 2010 LOU provided that the "all other terms and conditions of the [September 2005] MOU [would] remain in full force and effect."  2010 LOU.[4]

### B.    2012 MOU – The Parties' Current Operative MOU

In 2012, the parties signed a new MOU.  2012 MOU, Ex. 14 to Def.'s Mem. [Dkt. # 30-16]. In its WHEREAS clauses, the MOU acknowledges that Liberty and the union are party to the September 2005 MOU, as amended; various side letters; and the 2009 and 2010 LOUs. 2012 MOU at 1.  It further acknowledges that defendant operates three vessels referred to as "MSP Vessels":  the *Prestige New York*,[5] which is covered by an MSP Agreement, and the *Liberty Pride*

---

4      Defendant references an August 2010 MOU in its brief.  Def.'s Mem. at 18.  ("As noted in the Statement of Undisputed Material Facts, the only operative agreement between the Parties is the 2012 MOU because the August 2010 MOU covering dry bulk vessels and tankers was not extended.")  But a copy of that MOU has not been provided to the Court.

5      The *Prestige New York* was previously named the *Alliance New York*.  Def.'s SUF ¶ 20.

and *Liberty Promise*, which are not covered by MSP Agreements but are eligible for the program.

2012 MOU at 1.  It further acknowledges the following:

> WHEREAS, MEBA and the Company have *reaffirmed their commitment to a long-term collective bargaining relationship* to provide job security to the Union and uninterrupted operations to Liberty for the MSP Vessels; and

> WHEREAS, MEBA acknowledges that the Company has been engaged as an operator only in accordance with the MOU (as amended and supplemented from time to time) between the Company and the Union dated September 23, 2005.

2012 MOU at 1.

The parties agreed as follows:

> 1. DURATION OF AGREEMENT

> This MOU shall be deemed an extended contract to continue in full force and effect until midnight June 15, 2019 ("Expiration Date") and shall continue from year to year thereafter unless either party hereto shall give written notice to the other of its desire to amend the Agreement or notice of its desire to terminate the Agreement

It sets forth the parties' agreement regarding Liberty's participation in the union's pension plan and wage.  2012 MOU at 1–3.  And it provides that:

> (a) Except as expressly modified by this MOU, all other terms and conditions of employment of the CBAs, side letters, and letters of understanding are unchanged and shall remain in full force and effect.

2012 MOU at 3.  The MOU contains a narrow arbitration provision that only applies to specific wage and benefit negotiations that the parties contemplated under certain circumstances.  *See* 2012 MOU at 3–4.

The parties agree that the 2012 MOU is the current operative MOU.  Def.'s SUF ¶ 19; Pl.'s Resp. to Def.'s SUF ¶ 19, Pl.'s Opp. at 12.

III.    **The Liberty Peace**

On July 24, 2017, Liberty advised the union that Liberty would likely manage a new U.S. flag vessel, the *Liberty Peace*, which would not be covered by an MSP agreement, and that because the CBA did not apply to dry cargo U.S.-flag vessels not enrolled in the program, the CBA did not cover the ship.  Def.'s SUF ¶¶ 20–21.  Liberty proposed an amendment to the CBA to cover the new vessel, with lower total labor costs for vessel since it would not have the benefit of the annual MSP subsidy.  Def.'s SUF ¶ 21.  The parties were unable to reach agreement on the matter, the union filed a grievance asserting the *Liberty Peace* is covered by the parties CBA, and Liberty denied the grievance and refused to process it.  Def.'s SUF ¶ 23.  The union filed this lawsuit seeking to compel arbitration.  Compl.  There is no dispute regarding the authenticity of any MOU or LOU, so the sole issue now is whether they govern the *Liberty Peace*.

**STANDARD OF REVIEW**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is "genuine" only if a

reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation.  *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion."  *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989) (alteration in original), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982).  In assessing each party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party."  *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

## ANALYSIS

The parties have a dispute concerning whether the *Liberty Peace* is a vessel covered by their collective bargain agreement.  Plaintiff MEBA has brought an action seeking an order to compel Liberty to arbitrate the dispute, so the only question to be resolved on these cross-motions for summary judgment is whether the coverage question must be put to an arbitrator pursuant to the terms of an agreement between the parties, or whether it can be decided by a court.

The Supreme Court has explained that "arbitration is a matter of contract, and courts must enforce arbitration contracts according to their terms." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019).  The party asserting the existence of a contract, including a contract to arbitrate, bears the burden of proof.  *See Bailey v. Fed. Nat'l Mortg. Ass'n*, 209 F.3d

740, 746 (D.C. Cir. 2000).  The D.C. Circuit instructed the Court to "determine[] whether Liberty and MEBA had a valid contract for arbitration by looking at their whole agreement."  *Dist. No. 1,* 933 F.3d at 764.  The parties have provided the Master Agreements and the successive MOUs, LOUs, and side letters upon which they rely to the Court, and at this time, neither party contests the authenticity or completeness of any of the documents.  What is left is the legal question of how they should be interpreted.

It is undisputed that the parties entered into a collective bargaining relationship more than thirty years ago, in 1988, when Liberty became a signatory to the union's standard Tanker Vessels Master Agreement and its Dry Cargo Vessels Master Agreement.  Compl. ¶¶ 6, 8; Ans. ¶¶ 6, 8; Def.'s SUF ¶ 7.  The Master Agreements, which both exceed 100 pages in length, set forth numerous detailed requirements governing the employment of union workers, ranging from wages to pension plans, safety equipment, and even meals and uniforms.  *See* Tanker M.A.; Dry Cargo M.A.  And both of the master collective bargaining agreements contain a broad arbitration clause requiring that "[a]ll disputes relating to the interpretation or performance of this Agreement shall be determined in accordance with the provision of this Section."  Tanker M.A. at 10; Dry Cargo M.A. at 9.

It is also undisputed that from time to time, the parties signed MOUs that amended portions of the longstanding agreements, often the provisions relating to wages and benefits.  *See* 1990 MOU; 1994 MOU; 2000 MOU; June 2005 MOU; 2012 MOU.  Further, there is no dispute that the parties signed a September 2005 MOU to cover Liberty's "MSP Vessels."  *See* September 2005 MOU.  Finally, there is no dispute that the parties occasionally signed LOUs and exchanged side letters that embodied the parties' agreements or understandings about particular vessels.  *See* 2005 Side Letter; 2009 LOU; 2010 LOU.

The issue is whether the Master Agreements – which indisputably contain arbitration provisions – remain in effect.  Plaintiff, the union, asserts that the parties' collective bargaining agreement is comprised of the two Master Agreements, and that the MOUs expressly renewed that collective bargaining agreement on an ongoing basis, so the broad arbitration provision applies to the dispute over the *Liberty Peace*.

The employer's first argument in response is that the 1988 Master Agreements and the 1988 MOU implementing them expired by their terms on June 15, 1990.  It contends that the fact that the subsequent 1990 MOU contains a reference to the parties' "collective bargaining agreement covering tanker vessels" means that the parties extended only the Tanker Master Agreement at that time, and they let the Dry Cargo Master Agreement expire.  *See* Def.'s SUF ¶¶ 9–10.

But defendant's strained reading of the documents is inconsistent with the plain language of the Master Agreements and the 1988 and 1990 MOUs themselves, and to the extent the sloppy drafting of the 1990 MOU gives rise to any uncertainty, it is put to rest by the text of every MOU that followed and the parties' entire course of dealing over the past thirty years.

The 1988 MOU, signed contemporaneously with the Master Agreements, notably used a singular noun when it acknowledged that the parties "have *a* collective bargaining *agreement* covering ocean-going tankers *and* dry cargo vessels."  1988 MOU at 1 (emphasis added).  Indeed, the 1988 MOU specifically defined the term "Agreement" to refer to both master agreements:

> All wages, benefits, contributions and other terms and conditions of employment contained in the *Standard Dry Cargo and Tanker Vessels Agreements (herein "Agreement")* . . . shall apply to the Company's vessels, except for the following deletions and/or amendments . . . .

1988 MOU at 1 (emphasis added).  Thus, from the start, the parties agreed and understood that their 1988 collective bargaining "agreement" was comprised of both the Tanker Master Agreement and the Dry Cargo Master Agreement, as supplemented and amended by the 1988 MOU.

In 1990, in anticipation of the expiration of the 1988 agreement, the parties executed a new MOU.  It began with the recitation, "WHEREAS, the parties hereto have a collective bargaining agreement covering tanker vessels as amended and supplemented from time to time by agreement . . . (herein "Agreement"), of which the expiration date is June 15, 1990."  1990 MOU at 1.  Liberty says – aha!  With that sentence, the parties continued the Tanker Master Agreement, but they cut out Dry Cargo vessels forever. The problem with that interpretation is, the only collective bargaining agreement the parties *had,* and the only "collective bargaining agreement . . . *of which the expiration date is June 15, 1990*," was the existing "Agreement" that covered both tanker and dry cargo vessels.  *See* 1988 MOU.  The parties did not say, whereas the parties wish to enter into a new, slimmed-down collective bargaining agreement, and we want it to cover tanker vessels only; they said, whereas, we already have an agreement, and we want to extend it.  So even the language of the 1990 MOU does not support the employer's suggestion that this single prefatory clause had such a drastic impact on the contractual relationship, which had just been put into place two years before.[6]

---

6       The Court cannot help but comment that the entire set of documents is riddled with typographical errors, odd omissions, potentially vague terms, and inconsistencies between successive versions.  None of these is sufficiently material to affect the outcome of this motion, but it seems that in the future, it would behoove the parties to devote more time and attention to proofreading and draftsmanship at the front end in an effort to avoid the need to devote substantial resources and effort to fighting about what the documents mean at a later date.

And that becomes even more clear when one studies what happened afterwards. Every subsequent MOU specifically referenced and incorporated the parties' existing "collective bargaining agreemen**t**," covering tanker vessels *and* bulk or dry cargo vessels, when memorializing a new agreemen**t** with a new expiration date:

- 1994 MOU at 1 ("the parties hereto have a *collective bargaining agreement* covering tanker and bulk vessels . . . . *The aforesaid Agreement*, . . . together with the additional provisions hereinafter set forth, shall be deemed a New Agreement") (emphasis added).

- 2000 MOU at 1 ("the parties hereto have a *collective bargaining agreement* covering tanker and bulk vessels . . . . *The aforesaid Agreement*, except as otherwise amended herein, together with the additional provisions hereinafter set forth, shall be deemed a New Agreement") (emphasis added).

- June 2005 MOU at 1 ("the parties hereto have a *collective bargaining agreement* covering tanker and bulk vessels, . . . (herein '*CBA*') . . . . *The aforesaid CBA*, except as otherwise amended herein, together with the additional provisions hereinafter set forth, shall be deemed a New Agreement") (emphasis added).

- September 2005 MOU at 1 ("MEBA and Liberty are party to a *collective bargaining agreement ('CBA')* dated June 15, 2005 . . . covering tanker and dry cargo vessels . . . . [T]he Company and Union agree that all of the terms and conditions of *the CBA* are incorporated into this MOU and shall remain in full force and effect for the duration of this MOU.") (emphasis added).

- 2012 MOU at 1 ("MEBA and the Company have reaffirmed their commitment to a long-term *collective bargaining relationship* . . . ."); *id.* at 3 ("Except as expressly modified by this MOU, all other terms and conditions of employment of the *CBAs*, side letters, and letters of understanding are unchanged and shall remain in full force and effect.") (emphasis added).

The plain language of the set of contractual documents as a whole, with their repeated references to bulk or dry cargo vessels as well as tanker vessels, and the absence of any clear expression in 1990 of a mutual intent to exclude an entire category of vessels from the arrangement, undermine

17

Liberty's claim that the contractual relationship was somehow permanently altered by an anomaly in a "whereas" clause.

Liberty's second theory is that even if the collective bargaining agreement contained in the Master Agreements continued for some time after 1990, the parties' June 2005 MOU, covering dry bulk vessels and tankers, expired on September 30, 2011, and only the September 2005 and 2012 MOUs, the LOUs, and certain side agreements have "continuing application" after that. Def.'s SUF ¶¶ 18–19.[7]  According to the defendant, the agreement that remains applies only to the ships specifically "identified in the September 2005 MOU or those non-MSP vessels expressly incorporated through separate, subsequent LOUs." Def.'s SUF ¶ 18.  *See* Def.'s Mem. at 1 ("While Liberty and MEBA have engaged in a collective bargaining relationship for thirty years, which historically covered employees represented by the Union on certain types of U.S. Flag vessels, that relationship contracted in recent years to only cover a single type of vessel – pure car/truck carriers

---

[7]     While in its Statement of Undisputed Facts, Liberty cites the declaration of its Vice President of Operations for the proposition that "[o]n September 30, 2011, the Parties' June 2005 MOU, covering dry bulk vessels and tankers, expired and was not renewed," *see* Def.'s SUF ¶ 18, citing Campbell Decl. ¶ 19, it is entirely unclear where the date of September 30, 2011 comes from.  The June 2005 MOU states that it will remain in effect until June 15, 2010, "and shall continue from year to year thereafter unless either party shall give written notice to the other of its desire to amend the Agreement." June 2005 MOU at 1.  Liberty has not produced any record that purports to be written notice from either party seeking to amend or terminate the existing agreement.  Moreover, plaintiff disputes these assertions and disagrees with the conclusions they express.  Pl.'s Resp. to Def.'s SUF ¶ 18, Pl.'s Opp. at 11–12.  Therefore, the Court cannot consider defendant's SUF ¶18, which is more conclusory than factual in any event, to be undisputed.  But the dispute is not material to the resolution of the matter because the Court's ruling does not depend on the date of the expiration of the June 2005 MOU:  the MOU was in effect when the partiers entered into the September 2005 MOU, and both MOUs incorporated the CBA.

("PCTC" . . . ) either enrolled in the Maritime Security Program . . . or treated as enrolled in the program by express written agreement of the Parties.").[8]

But there is no evidence of this contraction:  the stated purpose of executing a new MOU in September of 2005, well before the previous one was set to expire, was to *add* vessels to the relationship – those enrolled in the federal MSP program – not to eliminate the ones that came before.  *See* September 2005 MOU at 1 (stating that MEBA and Liberty are parties to a collective bargaining agreement covering tanker and dry cargo vessels; that Liberty now intends to operate one or more vessels covered within the government's renewed Maritime Security Program; that the parties "wish to *amend* the CBA" to account for the recent enactment of the Maritime Security Act of 2003; that they "have *reaffirmed* their commitment of a long-term collective bargaining relationship;" and that "all of the terms and conditions of the CBA are incorporated into this MOU and shall remain in full force and effect for the duration of this MOU") (emphasis added).[9]  Thus, the June 2005 MOU covering tanker and dry cargo vessels, which had at least four and ¾ years left to go, was left unaffected.[10]

---

8    Plaintiff disputes these assertions.  *See* Pl.'s Resp. to Def.'s SUF ¶ 18, Pl.'s Opp. at 11–12; Pl.'s Opp. at 19–20.

9    If, as defendant contends, the operative 2012 MOU incorporated only the September 2005 MOU, and the 2005 MOU threw out the baby with the bathwater, there would have been nothing for the parties to "reaffirm" or "amend."

10    Defendant's argument that the narrow arbitration provision in the September 2005 MOU applying to "all grievances *arising under this MOU*," September 2005 MOU at 7 (emphasis added), supplants the arbitration provision in the CBA, Def.'s Reply at 3, is equally unavailing. The June 2005 MOU that remained in force, and the September 2005 MOU expanding its coverage, both incorporated the CBA, with its broad arbitration provision.

Moreover, the June 2005 MOU, like the other agreements executed over the course of the relationship between these parties, specified that any effort to modify it had to be clearly expressed in writing:

> **1990 MOU:**   "The aforesaid Agreement . . . shall be deemed a New Agreement . . . to continue in full force and effect until midnight, June 15, 1994, and shall continue from year to year thereafter unless either party hereto shall give *written notice* to the other of its desire to amend the Agreement or notice of its desire to terminate the agreement, . . . ." 1990 MOU at 1 (emphasis added).

> **1994 MOU:**   "The aforesaid Agreement . . . shall be deemed a New Agreement . . . to continue in full force and effect until midnight June 15, 2000, and shall continue from year to year thereafter unless either party hereto shall give *written notice* to the other of its desire to amend the Agreement or notice of its desire to terminate the Agreement, . . . . " 1994 MOU at 1 (emphasis added).

> **2000 MOU:**   "The aforesaid Agreement . . . shall be deemed a New Agreement . . . to continue in full force and effect until midnight, June 15, 2005 and shall continue from year-to-year thereafter unless either party hereto shall give *written notice* to the other of its desire to amend the Agreement, . . . . " 2000 MOU at 1 (emphasis added).

> **June 2005 MOU:**   "Duration of Agreement: The aforesaid CBA . . . shall be deemed a New Agreement . . . to continue in full force and effect until midnight June 15, 2010 and shall continue from year to year thereafter unless either party shall give *written notice* to the other of its desire to amend the Agreement, . . . . " June 2005 MOU at 1 (emphasis added).

The next MOU executed – the 2012 MOU that is currently in force – again "*re*affirmed" the parties' commitment to a long-term collective bargaining relationship.   2012 MOU at 1. Consistent with the parties' ongoing practice, the new MOU expressly incorporated the pre-existing collective bargaining relationship:   "*[e]xcept as expressly modified by this MOU*, all other terms and conditions of employment of the CBAs, side letters, and letters of understanding are unchanged and shall remain in full force and effect." 2012 MOU at 3 (emphasis added).   There

are no provisions in the 2012 MOU that purport to expressly modify the collective bargaining agreement to limit it to the vessels *added* in 2005, or to declare – contrary to every MOU that came before – that an eight page MOU was intended to memorialize the entire relationship between the parties without reference to the more comprehensive master collective bargaining agreements. Indeed, the language is to the contrary:  "all other terms and conditions of employment of the CBAs . . . are unchanged and shall remain in full force and effect."  2012 MOU at 3.

In sum, defendant's insistence that this dispute over the *Liberty Peace* is not covered by any collective bargaining agreement with an arbitration clause, because it is not one of the MSP vessels covered by the 2005 MOU, and therefore, cannot possibly be covered by the 2012 MOU, is directly contrary to the express language that announced the amendment of the CBA to include the MSP vessels in the first place:

> WHEREAS, MEBA and Liberty are party to a collective bargaining agreement ("CBA") dated June 15, 2005 . . . whereby MEBA represents *all* of the licensed deck and engineer officers . . . working aboard *all of the United States flag vessel owned and operated by the Company* . . . .

September 2005 MOU at 1.  Since the 2012 MOU did not disavow this arrangement, but instead, expressly agreed that it "remained in full force and effect," *see* 2012 MOU at 3, and Liberty has not pointed to any other document memorializing a mutual intention to abandon the arrangement, defendant's second attempt to contort the language of the collective bargaining relationship fails as well.

Moreover, defendant's argument that the *Liberty Peace* isn't covered by an arbitration clause because it isn't covered by the 2012 MOU puts the cart before the horse, and hinges upon the very coverage finding that MEBA maintains must be arbitrated.  This circular reasoning also undermines defendant's contention that the execution of the separate 2009 and 2010 LOUs for

other PCTC vessels demonstrates that the "CBA did not extend to non-MSP vessels absent an express contract amendment otherwise."  Def.'s Reply at 7 (adding that no such LOU exists for the *Liberty Peace*).   The parties' own agreements contradict that assertion; in 2009 and February 2010, the parties were still operating under the June 2005 MOU, which applied, as always, to tanker and bulk vessels, as amended by the September 2005 MOU, which extended the coverage specifically to the new PCTC vessel that Liberty intended to enroll in the new MSP program.  The September 2005 MOU set out the particular scale of wages for MSP vessels.  Thus, the letters of understanding were needed to bring the new PCTC vessels that were not likely to be enrolled under the MSP Program under the particular terms and conditions set out in the September 2005 MOU.

More important, the *Liberty Peace* was acquired after the 2012 MOU was executed, incorporating both the existing collective bargaining agreement and other agreements.  If the Court finds, as it has, the existence of a valid arbitration provision, it is not up to it to go further and determine if it falls under the currently operative agreement or not.  That is a different question.

## CONCLUSION

For the foregoing reasons, including the fact that the problem identified by the D.C. Circuit – the lack of authentic documents – has been obviated, the Court will **GRANT** plaintiff's motion for summary judgement and **DENY** defendant's motion for summary judgment, and it will order the parties to arbitrate their dispute concerning the *Liberty Peace*.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  September 30, 2021

22